**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CIVIL ACTION NO. 11-CV-72-DLB-EBA**

**GLENN JACKSON**                                                                    **PLAINTIFF**

**vs.**                        **MEMORANDUM OPINION AND ORDER**

**TRAVIS STEELE, ET AL.**                                                      **DEFENDANTS**

*** *** *** ***

# I. INTRODUCTION

This matter arises out of Plaintiff Glenn Jackson's arrest at his home on the night of July 10, 2010. Plaintiff alleges that he was unlawfully beaten and injured by the Defendant Officers during his arrest. Pursuant to 42 U.S.C. § 1983, Plaintiff brings various constitutional claims against Defendants Sergeant Travis Steele, Officer Tony Cantrell, Officer Chris Yavorcik, Sergeant Casey Brammell, Grayson Chief of Police Ed Ginter, Grayson Mayor George Steele, Unknown Police Officers, and the City of Grayson, Kentucky. Plaintiff also brings state law claims for assault and battery, intentional infliction of emotional distress, negligence, negligent infliction of emotional distress, respondeat superior, negligent supervision, and punitive damages. The Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. # 40). The motion has been fully briefed (Docs. # 40-1, 42, 43), and the matter is

now ripe for review. For the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. # 40) is hereby **GRANTED.**

## II.  FACTUAL AND PROCEDURAL BACKGROUND

On July 10, 2010, Officer Tony Cantrell was investigating a recent burglary in Grayson, Kentucky. (Doc. # 40-2 at 6:12-17). During the course of the investigation, Cantrell was informed that the stolen property may have been traded to Plaintiff Glenn Jackson for money and drugs. (*Id.* at 9:7-22). Cantrell relayed this information to Sergeant Travis Steele, who obtained a warrant to search Mr. Jackson's home, a doublewide trailer. (*Id.* at 11:12-21; Doc. 40-3 at 15:8-17:10, 32:24).   Cantrell's confidential informants also notified him that "Mr. Jackson had weapons all around the house." (Doc. # 40-2 at 9:5; Doc. # 40-3 at 22:11-20).

Due to the perceived risk of entering a house believed to contain numerous firearms, Sergeant Steele made the decision to use a "dynamic entry" to enter the house and execute the warrant. (Doc. # 40-3 at 14:3-15:7). Sergeant Steele had received training at Fort Leonard Wood, Missouri on the execution of high risk search warrants against individuals with weapons. (*Id.* at 11:17-24). The members of the team—Steele, Cantrell, Officer Roy Ison,[1] Chief Ed Ginter, Officer Chris Yavorcik, Officer Casey Brammel, and Officer Wes Boggs—met prior to the operation to plan their procedure. (*Id.* at 23:18-24:3). Each member of the team was assigned specific duties: Cantrell was to perform the "knock and announce" and breach the door using a battering ram (*Id.* at 24:13-15); Steele and Ison were to enter the residence first and secure the area to the left of the front door (*Id.* at 34:6-34:22); Ginter was to enter the house after Steele (Doc. # 40-3 at 41:1-12); Cantrell and Yavorcik were to follow and

---

[1] Roy Ison is not named as a Defendant in Plaintiff's suit, nor was he deposed by either party's counsel.

secure the area to the right (Doc. # 40-6 at 7:5-14); Brammel was to secure the outside perimeter (Doc. # 40-7 at 6:19-24). The record is unclear as to what role Boggs played in the search.

Around midnight on July 10, the members of the team executed the search warrant and performed their duties as assigned. In the dark of night, Ison and Steele entered the house and proceeded into Plaintiff's bedroom, where they allege he was "setting [*sic*] up in the bed with his hand on a pistol." (Doc. # 40-3 at 35:2-3). In his deposition Plaintiff stated that he had a pistol under his pillow and that it was "possible" that he had the gun in his hand when Steele and Ison approached him. (Doc. # 40-4 at 125:7-126:4). Officer Ison began giving Plaintiff verbal commands to "get his hands off the gun, to get them up, and to get off the bed." (Doc. # 40-3 at 36:7-8). Sergeant Steele testified in his deposition that Plaintiff was not complying with these verbal commands. (*Id.* at 36:4-5). Ison then physically moved Plaintiff onto the floor. (*Id.* at 36:19-37:19). As Plaintiff feel to the floor, the pistol dropped to the bed. (*Id.* at 38:3).

Once Plaintiff was on the floor, Steele testified that Plaintiff was laying face-first on an assault rifle. (*Id.* at 38:9-12). At this point, Ison's flashlight went out, and the room was temporarily in complete darkness. (*Id.* at 38:17-19). Steele placed his foot on Plaintiff's left calf to feel whether he was rolling over, as both he and Ison gave Plaintiff commands to get his hands out from under his body. (*Id.* at 38:21-39:2). Steele then reached for the light cord on the ceiling fan and turned on the light. (*Id.* at 39:4-6). Shortly thereafter, another officer entered the room and cuffed Plaintiff. (*Id.* at 39:16-17). Plaintiff was then escorted onto the living room couch while the officers searched the

premises. (*Id.* at 40:13-14; Doc. # 40-2 at 17:18-20). At this time, Plaintiff denied that he was injured and refused medical treatment (Doc. # 40-3 at 41:1-3).

Plaintiff alleges that Steele physically assaulted him while he was still in bed and after he was pulled out of bed. (*See* Doc. # 2 at ¶ 11; Doc. 40-4 at 114:10-14). Plaintiff also stated in his deposition that the only two officers that had physical contact with him were Steele and Ison. (Doc. # 40-4 at 130:15-131:7).

Photos from the search and testimony of the other officers involved confirm that Plaintiff had numerous firearms, including assault rifles, staged throughout his home. (Doc. # 40-6 at 11-13; Doc. #40-5). They also confirm that a pistol remained on Plaintiff's bed after he was removed from it. (Doc. # 40-5).

Defendant Ison was wearing a video camera which recorded the initial entry into the premises, and Ison and Steele's initial interaction with Plaintiff. The Court has reviewed this video, and while portions of it are difficult to analyze due to darkness, it largely confirms the testimony of Defendants, including that Plaintiff was lying on or near an assault rifle while he was on the floor. At no point during the video is any use of force against Plaintiff visible.[2]

After his arrest, Plaintiff was transported to the Carter County Detention Center. (Doc. # 40-4 at 138:1-8; Doc. # 40-8 at 10:15-20). At the time he was processed, the booking officers determined that he did not require medical attention. (Doc. # 40-8 at 13:8-25). Plaintiff also denied needing any medical attention and did not inform anyone

---

[2] In Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, he states that "[t]he Plaintiff has a videotape of Steele pistol whipping Jackson." (Doc. # 42 at 4). The video the Court has reviewed does not show any such action. If Plaintiff is in possession of a different video, it has not been provided to the Court.

at the jail that he had allegedly been assaulted. (*Id.* at 17-21; Doc. # 40-4 at 161:10-162:13).

Following his release, Plaintiff went to King's Daughter's Emergency complaining of "right facial swelling, decreased hearing, right shoulder, rib, and knee pain, and bruising . . . ." (Doc. # 40-4 at 162:23-163:15). Nine days later, he presented to the VA Medical Center complaining of an injury to his penis. (Doc. # 40-9).

Almost a year after the incident, on July 8, 2011, Plaintiff filed the *pro se* Complaint discussed in Part I, *supra*.

### III. ANALYSIS

#### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co.*, 475 U.S. at 586. It must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir.2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir.1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

## B. Plaintiff's Claims Against Unknown Police Officers

In his Complaint (Doc. # 2), Plaintiff asserts several federal and state law claims against "Defendant John Doe, unknown person or persons." However, Plaintiff has yet to identify these "unknown" defendants or serve them with civil summonses and the Complaint. Federal Rule of Civil Procedures 4(m) states, in pertinent part:

> If a defendant is not served within 120 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Plaintiff filed his Complaint on July 8, 2011 (Doc. # 2). Plaintiff had until august 13, 2013 to complete discovery. (Doc. # 24). Despite the lengthy and extended discovery period, Plaintiff has yet to identify any John Doe defendants and, therefore, failed to serve them with civil summonses and the Complaint, clearly in violation of the time limit provided by

Rule 4(m). Plaintiff has been given ample time to conduct discovery and obtain the names of the unknown defendants and has not shown good cause for his failure to effectuate service. Accordingly, any claims asserted against John Doe Defendants in this action must be **DISMISSED**. *See Petty v. Cnty. of Franklin,* 478 F.3d 341, 345-46 (6th Cir. 2007) (affirming district court's dismissal of John Doe defendants because Plaintiff failed to specifically name the John Doe defendants after the close of discovery).

### C.   Section 1983 Claims

Title 42, Section 1983 of the United State Code specifically authorizes "any citizen of the United States or other person within the jurisdiction thereof" to pursue "an action at law [or] suit in equity" against every person who under color of state law "causes . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983; *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002). To state a claim under § 1983, a plaintiff must establish both that the defendant acted under color of state law and that the defendant deprived the plaintiff of a federal statutory or constitutional right. *Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir. 2007) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).

#### 1.   Fourth Amendment Violations

##### a.   Qualified Immunity

In his Complaint (Doc. # 2), Plaintiff asserts a claim under the Fourth Amendment for use of excessive force. Specifically, Plaintiff claims that his alleged attack by the officers during their execution of the search warrant and his arrest was objectively

unreasonable under the circumstances. In response, Defendants claim they are entitled to qualified immunity.

In the context of a § 1983 action, qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This immunity is granted broadly and "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity is "an *immunity from suit* rather than a mere defense to liability." *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in original). Accordingly, the Court takes seriously its evaluation of whether particular defendants are entitled to qualified immunity as it is "intended to serve the public interest by permitting officials to take action with independence and without fear of consequences." *Crockett v. Cumberland College*, 316 F.3d 571, 579 (6th Cir. 2003) (internal quotations omitted).

The Court follows a two-step analysis when evaluating whether a public official is entitled to qualified immunity.[3] *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir.2009). In most cases, the Court will first inquire whether, taken in a light most favorable to the party asserting injury, the defendant violated plaintiff's constitutional rights. *Id.* Second, assuming this threshold inquiry is satisfied, the Court assesses

---

[3] Ordinarily, analysis of a qualified immunity claim would include a third step—an inquiry into whether the plaintiff offered sufficient evidence to indicate that what the officers allegedly did was objectively unreasonable in light of a clearly established constitutional right. *See, e.g.*, *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir.2003). However, in an excessive force case, in order to find a constitutional violation, the Court must determine that the defendant's conduct was objectively unreasonable, rendering the third step redundant. "Thus, qualified immunity in excessive force cases is a two-step analysis." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir.2009).

whether that right was clearly established at the time of the alleged violation. *Id.* While this sequence is often appropriate, the Supreme Court has clarified that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Once qualified immunity is raised as a defense, the burden is on the plaintiff to demonstrate that qualified immunity does not apply. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir.2006) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir.2000)). Accordingly, for Plaintiff's claims to survive, he must not only demonstrate that a constitutional violation occurred, but also that Defendants are not entitled to qualified immunity.

### b. Clearly Established Right

Neither party appears to dispute whether the right at issue here—i.e., the right to be free from excessive force during the execution of a search warrant and subsequent arrest—was clearly established at the time of the incident *sub judice.* The Court agrees that the right to be free from excessive force in this context is clearly established, and so the question of qualified immunity turns on whether this clearly established right was violated by Defendants.

### c. Constitutional Violation

Plaintiff's excessive force claim arises out of his arrest by the defendant officers and is therefore properly analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]ll claims that law

enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."). In order to determine whether the force used to effect a particular seizure is reasonable, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. This is an "objective reasonableness" test that does not include the underlying intent or motivation of the officer. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir.2004).

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene at that time, "rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Factors to be considered include: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* However, these factors are not an exhaustive list, and the ultimate inquiry rests on whether the seizure was reasonable under the "totality of the circumstances." *Ciminillo*, 434 F.3d at 467. Finally, the reasonableness inquiry "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

When considering the objective reasonableness of an officer's use of force, the Court must address each officer's potential liability individually based on his own

actions. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). "To hold an officer liable for the use of force, a plaintiff must prove that the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Id.* (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir.1997)). Generally, mere presence at the scene does not render an officer liable for another officer's use of force unless the plaintiff proves that the passive officer was directly responsible for the action. *Id.*

The Court will analyze the actions of each named defendant using these standards.

### i. Defendants Cantrell, Yavorcik, Brammell, Ginter, and George Steele

Plaintiff admits, and the video recording confirms, that Ison and Steele were the only two officers present in Plaintiff's bedroom at the time when Plaintiff alleges an assault occurred. Plaintiff also stated that the only two officers who had any physical contact with him were Ison and Steele. Plaintiff has provided no evidence to support that any other Defendant was involved in any alleged assault.

It is undisputed, then, that Defendants Cantrell, Yavorcik, Brammell, Ginter, and George Steele were not present when the alleged assault occurred, did not participate in the alleged assault, and were in no position to prevent it. Section 1983 claims for excessive force against these defendants in their individual capacities must therefore fail. Accordingly, § 1983 claims against these five Defendants in their individual capacities are **DISMISSED**.

### ii. Defendant Travis Steele

Travis Steele is the only Defendant who was present at the time of the alleged assault on Plaintiff.  While Roy Ison was also present in Plaintiff's bedroom, he is not named as a Defendant in this suit and any actions he may or may not be responsible for are not proper subjects for review by this Court.

In reviewing whether Travis Steele violated Plaintiff's constitutional rights, the Court must construe all facts in the light most favorable to Plaintiff. However, it should be noted that Plaintiff's briefing provides no statement of facts, and makes numerous bald assertions without reference to the record. Several of these assertions are directly contradicted by the record. For example, Plaintiff states that "Steele admitted that he used force to take Jackson to the ground." (Doc. # 42 at 9). In fact, Steele made no such admission in his deposition, and stated that it was Ison who "got [Jackson] out of bed." (Doc. # 43 at 36:19-20). Plaintiff also twice states in his briefing that he did not have a pistol in his hand when Steele and Ison entered the bedroom (*Id.* at 9, 13), however he fails to cite to any part of the record to support this assertion.  Rather, as Defendants point out, Plaintiff admitted in his deposition that it was "possible" that he had the gun in his hand when Steele and Ison approached him, (Doc. # 40-4 at 125:7-126:4). Finally, Plaintiff states in his briefing that "Steele admitted that the last time he saw Jackson he was lying face down with blood coming out of his ear." (*Id.* at 14). Steele made no such statement in his deposition.

As stated above, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

Plaintiff has simply failed to do so throughout his briefing. He has also failed to point to any evidence, other than his own deposition, that Steele used any force at all against him. The video evidence shows that, from the time after the lights were turned back on to the time when the other officers entered the bedroom, Steele used no force against Jackson.

It is impossible to determine what happened while the lights were out from the video evidence. It is therefore possible that Steele used some amount of force against Plaintiff during this period. Plaintiff alleges that he was punched in the ear by Steele at this time (Doc. # 40-4 at 115-16). He provides no evidence of this occurrence, however, but generally refers to his deposition testimony and a photograph of a pillow with alleged bloodstains on it. It is therefore arguable whether Steele used any force at all.

Assuming, *arguendo*, that Steele did punch Plaintiff in the head or otherwise use force against him as alleged by Plaintiff, an analysis of each of the *Graham* factors in this situation shows that the use of force was reasonable. The officers believed that Plaintiff was in receipt of stolen property when they executed the search warrant. That crime, in and of itself, is not necessarily severe.[4] However, the facts of the alleged crime made an otherwise non-violent offense more alarming to Steele and the other officers as they executed the search warrant; Plaintiff was believed to have traded guns and drugs for the stolen property.

Plaintiff also posed a significant threat to the officers' safety. Before they executed the search warrant, they were given information that Plaintiff stored many guns in his trailer. Steele and the other officers entered Plaintiff's unfamiliar trailer in the

---

[4] Receiving stolen property is either a first degree misdemeanor or a fifth degree felony, depending on the value of the property. O.R.C. § 2913.51 (C)-(D).

dark of night, not knowing where Steele was located or where he stored his guns. When Steele entered Plaintiff's bedroom, he found Plaintiff sitting up in bed with his hand on a pistol.  Plaintiff ignored repeated commands to put the weapon down, prompting Ison to force Plaintiff to the ground.  When Plaintiff fell, he landed face-first on top of a rifle.  Plaintiff again ignored commands to get his hands out from underneath him and, presumably, off the gun.  The lights then went out in the bedroom, adding more uncertainty to the situation.  Steele reached for Plaintiff's calf with his own foot to ensure he had not used the darkness to rollover or make any other furtive movement. It was at this time – in the darkness of Plaintiff's bedroom -- that any potential punch or use of force by Steele occurred.  In this rapidly evolving and uncertain situation, with the officers in close quarters of a man armed with a rifle, it was reasonable for Steele to have used non-lethal force against Plaintiff in order to disarm him and prevent him from using his firearm against them.

The Sixth Circuit's decision in *Gaddis ex rel. Gaddis v. Redford Township* is instructive and supports the Court's conclusion.  364 F.3d 753 (6th Cir. 2004).  There, officers surrounded a man who was armed with a knife for nearly two minutes and repeatedly ordered him to drop the weapon.  *Id.* at 774.  When the man announced that he was leaving the scene in his car, one of the officers sprayed him with pepper spray. *Id.*  The *Gaddis* Court noted that, "[a]s a general matter, this court has expressed doubt 'that the use of non-lethal force against an armed and volatile suspect constitutes excessive force.'"  *Id.* (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 508 (6th Cir. 2002)).   The *Gaddis* Court recognized that the man was armed with a knife and "at least somewhat 'volatile,' as he was refusing to submit to arrest."  *Id.*  Furthermore, the

court found that when the man brandished the knife, it was "reasonably interpreted as a sign of intent to resist, perhaps violently." *Id.* at 775. Under these facts, and others, the court held it was not unreasonable for the officer to spray the man with pepper spray. *Id.*

The facts of the case *sub judice* are, in many ways, even more alarming than those in *Gaddis*. Here, Plaintiff was brandishing a firearm when officers entered the room and he refused repeated commands to put it down. A firearm undoubtedly presents a greater threat than a knife to the officers' safety. And as the *Gaddis* Court noted, it was reasonable for the officers to believe that, because Plaintiff was brandishing a firearm, he presented an immediate threat to their safety and intended to resist arrest. Furthermore, the officers in this case were in an even more uncertain and volatile situation: they were in a dark, small bedroom with a man who possessed a pistol and rifle. It was therefore reasonable for Steele to use non-lethal force to subdue and disarm Plaintiff.

While Plaintiff argues that his age and character prove that Defendants had no reason to believe that he had any propensity towards violence, (Doc. # 42 at 12), the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene at that time, "rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Steele "thus cannot [be] charge[d] . . . with knowledge that he did not possess," *Wells v. City of Dearborn Heights*, 538 Fed. App'x 631, 637 (6th Cir. 2013), in this instance, whether Plaintiff had violent tendencies. Instead, Steele was faced with an armed suspect in a house full of weapons, and it was

reasonable for him to use non-lethal force to subdue Plaintiff (assuming, of course, that he did in fact use force).

For these reasons, Travis Steele is entitled to judgment as a matter of law on Plaintiff's § 1983 excessive force claim.

### 2. Municipal Liability

Plaintiff's Complaint alleges claims against the Grayson Chief of Police and Mayor in their official capacities, along with claims against the City of Grayson. "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

A municipality can only be liable under Section 1983 if the plaintiff establishes that: "(1) the plaintiff's harm was caused by a constitutional violation; and (2) the [municipality] was responsible for that violation." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009). Municipalities cannot be held liable under Section 1983 on a *respondeat superior* theory. *Monnell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, "municipalities are liable for harms resulting from a constitutional violation *only* when the injury resulted from an 'implementation of [the municipality's] official policies or established customs.'" *Spears*, 589 F.3d at 256 (quoting *Monnell,* 436 U.S. at 708 (Powell, J., concurring)). "'A systematic failure to train police officers adequately is a custom or policy which can lead to municipal liability.'" *Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir.2012) (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010)).

Plaintiff has failed to establish each of the elements necessary to prove municipal liability under Section 1983. Defendant Travis Steele and Roy Ison were the only

Grayson officials to arguably use force against Plaintiff. As explained above, Travis Steele did not use excessive under the circumstances and, therefore, did not deprive Plaintiff of his Fourth Amendment rights. The Court's previous analysis of Steele applies equally to Roy Ison, who pushed Plaintiff out of his bed to disarm him and gain control over him. That, too, was a reasonable use of force. Accordingly, Plaintiff has failed to demonstrate that a constitutional violation occurred, and the City of Grayson cannot be liable on a municipal liability theory under Section 1983. *See Davenport v. Casey*, 521 F.3d 544, 554 (6th Cir. 2008) (holding that the city was entitled to summary judgment because the employee-officer did not violate the plaintiff's constitutional rights); *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) ("There can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act."); *Mattox v. City of Forest Park*, 183 F.3d 515, 523 (6th Cir. 1999) ("If the plaintiffs have failed to state a claim for violation of a constitutional right at all, then the City of Forest Park cannot be held liable for violating that right nay more than the individual defendants can.").

Assuming, *arguendo*, that a constitutional violation occurred, Plaintiff has failed to show that the City of Grayson is responsible for that violation. Although his Complaint does not clearly articulate how Grayson is liable, Plaintiff's Memorandum in Opposition appears to argue that the City failed to properly train its officers on the use of force, and that it should not have allowed Travis Steele to execute high risk search warrants because he had received his training in executing such warrants from "two organizations trained to kill on foreign soil." (Doc. # 42 at 3).

A municipality is responsible for failing to train its officers if the plaintiff can prove three elements: (1) "that the training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [County]'s deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)).

Plaintiff has failed to provide *any* evidence to prove any of the three prongs here. Simply referring to the Army and Marines as "mechanisms of death," (Doc. # 42 at 11), does not suffice as proof of inadequate training, deliberate indifference, or causation. Plaintiff has not even provided evidence of what the City's Use of Force Policy actually states. Bald assertions of inadequacy, without support, will not prove a cause of action.

For these reasons, the City of Grayson is entitled to summary judgment on Plaintiffs' Section 1983 claims. Accordingly, this claim is **DISMISSED**.

### 3. Other Constitutional Claims

At various points throughout his *pro se* Complaint, Plaintiff also alleges that Defendants violated his constitutional rights under the Eighth, Tenth, and Fourteenth Amendments (Doc. # 2, at ¶¶ 10, 18, 19, 23). However, Plaintiff has failed to raise any additional facts other than those relating to his Fourth Amendment excessive force claim. The Supreme Court has made clear that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham*, 490 U.S. at 395 (emphasis in original). More recently, the Court noted that "*Graham* simply requires that

if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision . . . ." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). The Sixth Circuit has stated that the Fourth Amendment protects a suspect until his or her probable cause hearing, at which point he or she becomes a pretrial detainee and is then protected by the Fourteenth Amendment Due Process Clause. *Aldini v. Johnson*, 609 F.3d 858, 866-67 (6th Cir. 2010).

Furthermore, the Eighth Amendment's ban on "cruel and unusual punishment" applies only to protect "those convicted of crimes" and "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Whitley v. Albers*, 475 U.S. 312, 318 (1986) (citing *Ingraham v. Wright*, 430 U.S. 651, 664 (1977)).

Finally, the Tenth Amendment is not a proper basis for a § 1983 claim both because it is not a "fount of individual constitutional rights" and because it constrains the power of the Federal Government and not the states. *Stone v. City of Prescott*, 173 F.3d 1172, 1175 (9th Cir. 1999). See *also U.S. v. Darby*, 312 U.S. 100, 124 (1941) ("The amendment states but a truism that all is retained which has not been surrendered. There is nothing in the history of its adoption to suggest that it was more than declaratory of the relationship between the national and state governments as it had been established by the Constitution before the amendment or that its purpose was other than to allay fears that the new national government might seek to exercise powers not granted, and that the states might not be able to exercise fully their reserved powers.").

As stated above, since the officers' alleged use of force occurred during the course of the execution of a search warrant and arrest of Plaintiff, his § 1983 claim arises solely under the Fourth Amendment. *See Henderson v. Reyda*, 192 F. App'x 392, 396 (6th Cir. 2006) (where excessive force claim arose from officer's seizure of Plaintiff's person, Plaintiff could only proceed under the Fourth Amendment and not the Fourteenth Amendment). Accordingly, Plaintiff's Eighth, Tenth, and Fourteenth amendment claims are **DISMISSED**.

### D. State Law Claims

Plaintiff's Complaint alleges numerous claims under Kentucky state law. These claims will be addressed in turn.

#### 1. State Constitutional Violations

Plaintiff's Complaint alleges that his rights under the Kentucky Constitution were violated. The Kentucky Supreme Court recently held that Kentucky law does not recognize a cause of action for alleged violations of Kentucky constitutional rights. *St. Luke Hosp., Inc. v. Straub,* 354 S.W.3d 529, 536–37 (Ky. 2011). Specifically, the Kentucky Supreme Court ruled that Kentucky's General Assembly has not authorized a statutory private right of action for state constitutional violations. *Id.* The Court also refused to create a constitutional tort akin to a federal *Bivens* action for violations of Kentucky's Constitution. *Id.* Accordingly, Kentucky law does not recognize a cause of action to support this claim, and it is therefore **DISMISSED**.

#### 2. Assault, Battery and Negligence

Plaintiff's state-law assault, battery and negligence claims against Defendants are barred because the Defendants are entitled to qualified official immunity. Under

Kentucky law, a public officer is entitled to qualified immunity from liability "for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Qualified immunity applies "to the negligent performance by a public officer of employee of (1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of the employee's authority." *Id.* "Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Id.* at 523.

Defendants have shown *prima facie* that any use of force that occurred against Plaintiff was within their discretionary authority. Under Kentucky law, a peace officer "is entitled to use such force as is necessary, or reasonably appears so, to take a suspect into custody." *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. Ct. App. 2007). As previously stated, each of the officers has shown that they either did not use force at all or acted pursuant to this authority in using objectively reasonable force against Plaintiff in order to effect an arrest and protect other themselves from perceived imminent harm. Thus, the burden shifts to Plaintiffs to establish that the officers deployed deadly force in bad faith.

Again, Plaintiff has provided no evidence to support a finding of bad faith. "Bad faith can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position . . . ; or if the officer or employee *willfully or maliciously* intended to harm the plaintiff or acted with a corrupt

motive." *Yanero*, 65 S.W.3d at 523. As already discussed herein, any use of force in this case was objectively reasonable and, thus, there was no violation of Plaintiff's clearly established constitutional rights. Moreover, Plaintiff has not offered any proof that the officers willfully or maliciously intended to harm Robert in a way that was not authorized by law. Accordingly, Defendants are entitled to qualified official immunity on Plaintiffs' state law battery and negligence claims. These claims are therefore **DISMISSED**.

### 3.   Intentional/Negligent Infliction of Emotional Distress

Plaintiff brings claims for intentional infliction of emotional distress and negligent infliction of emotional distress against all defendants. To prevail on his claim for intentional infliction of emotional distress, Plaintiff must show that (1) "defendant's conduct was intentional or reckless," (2) "that the conduct was so outrageous and intolerable so as to offend generally accepted standards of morality and decency," (3) "that a causal connection exists between the conduct complained of and the distress suffered," and (4) "that the resulting emotional distress was severe." *Brewer v. Hillard*, 15 S.W.3d 1, 6 (Ky. Ct. App. 1999).

Negligent infliction of emotional distress is analyzed in accordance with common law negligence: (1) the defendant must have owed a duty of care to the plaintiff, (2) which it breached, (3) legally causing (4) injury to the plaintiff. *See Osbourne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012). In addition, a plaintiff's emotional distress "must be severe or serious." *Odom v. Hiland*, No. 5:12CV-P124-R, 2013 WL 2297071, at *10 (W.D. Ky. May 24, 2013) (citing *Osborne*, 399 S.W.3d at 9).

Kentucky courts have viewed the tort of intentional infliction of emotional distress as a gap-filler. *Childers v. Geile*, 367 S.W.3d 576, 582 (Ky. 2012). As the court in *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295 (Ky. Ct. App. 1993), explained:

> [W]here an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie.

853 S.W.2d at 299. Here, Plaintiff has not presented any evidence from which a jury could infer that the officers' actions were motivated solely by a desire to cause Plaintiff extreme emotional distress. Therefore, this claim is improper insofar as it duplicates Plaintiff's other claims for assault and battery, for which recovery of emotional distress is permitted.

The tort of negligent infliction of emotional distress is similarly duplicative, and also fails as a matter of law. *See Scherzinger v. Bolton*, 3:11-CV-11-H, 2013 WL 3166163, at *10 (W.D. Ky. June 20, 2013); *Woosley v. City of Paris*, 591 F. Supp. 2d 913, 923 (E.D. Ky. 2008).

For these reasons, Plaintiff's claims for intentional and negligent infliction of emotional distress as to all Defendants are hereby **DISMISSED**.

### 4. Respondeat Superior

Liability under a theory of *respondeat superior* can only exist when there is an underlying tort. *Patterson v. Blair*, 172 S.W3d 361, 363 (Ky. 2005). As discussed above, there was no such tortious act in this case, and so this claim is also **DISMISSED**.

### 5. Negligent Supervision

Kentucky has adopted the Restatement (Second) of Agency's definition of the tort of negligent supervision. *See Smith v. Isaacs,* 777 S.W.2d 912, 914 (Ky. 1989); *Turner v. Pendennis Club,* 19 S.W.3d 117, 121-22 (Ky. Ct. App. 2000); *Oakley v. Flor–Shin, Inc.,* 964 S.W.2d 438, 442 (Ky. Ct. App. 1998). The Restatement defines the tort as follows: "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: . . . (c) in the supervision of the activity." Restatement (Second) of Agency § 213 (1957). The tort of negligent supervision is a second tort that derives from a tort committed by the person negligently supervised. In other words, Grayson could be liable for a tort committed by its employee if the employer did not reasonably supervise the employee.

Again, Plaintiff has provided no evidence to show that the City of Grayson was negligent or reckless in its supervision of its officers. Plaintiff's only "proof" of recklessness is its assertion that an officer trained by "two organizations trained to kill on foreign soil" should not be allowed to execute search warrants. As discussed above, such bald assertions absent any evidence will not sustain a cause of action. Therefore, this claim is **DISMISSED**.

### 6. Punitive Damages

Kentucky Revised Statutes § 65.2002 states that "[t]he amount of damages recoverable against a local government for . . . personal injury . . . arising out of a single accident or occurrence, or sequence of accidents or occurrences, shall not exceed the total damages suffered by plaintiff." This appears to exclude punitive damages from being assessed against a city government because "punitive damages have no relation

to compensating a plaintiff for injury, but instead exist as a punishment for the wrongdoer." *Jackson v. Tullar*, 285 S.W.2d 290, 298 (Ky. Ct. App. 2007). Therefore, Plaintiff's punitive damages claim against the City of Grayson fails as a matter of law.

With regard to Plaintiff's punitive damages claims against the other Defendants, K.R.S. § 411.184 states that "[a] plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." Again, Plaintiff has provided no evidence or proof of oppression, fraud, or malice. Therefore, his claims for punitive damages against all defendants are **DISMISSED**.

## IV. CONCLUSION

Therefore, for the reasons stated herein, **IT IS ORDERED** as follows:

1.      The Defendants' Motion for Summary Judgment (Doc. # 40) is hereby **GRANTED**;

2.      Plaintiff's federal and state law claims are hereby **DISMISSED WITH PREJUDICE;**

3.      This case is hereby **STRICKEN** from the active docket of this Court.

4.      A Judgment shall be entered contemporaneously herewith.

This 19th day of June, 2014.



Signed By:

*David L. Bunning*

United States District Judge